# **EXHIBIT 16**

IRS Pub. 2104 (I.R.S.), 2019 WL 8918828

Internal Revenue Service (I.R.S.)
Taxpayer Information Publication

PUBLICATION 2104 (REV. 12-2019) ANNUAL REPORT TO CONGRESS 2019

For use in preparing 2019 Returns
Released: December,2019

**PREFACE: Introductory Remarks by the Acting National Taxpayer Advocate**

*1 I respectfully submit for your consideration the National Taxpayer Advocate's 2019 Annual Report to Congress. This is the first Annual Report since 2000 that has not been submitted by Nina Olson. Nina retired on July 31, 2019, after leading the Taxpayer Advocate Service for over 18 years. During her time as the National Taxpayer Advocate, Nina fought tirelessly for taxpayer rights and created an organization of advocates who will carry on her legacy. The Taxpayer Advocate Service and all taxpayers are forever grateful for her advocacy.

**Changes to the Annual Report to Congress**

The 2019 Annual Report looks decidedly different from previous reports in several ways. Section 7803(c)(2)(B)(ii) of the Internal Revenue Code, as amended by the Taxpayer First Act (TFA), requires the National Taxpayer Advocate to submit this report each year and to include in it, among other things, a description of the ten most serious problems encountered by taxpayers as well as administrative and legislative recommendations to mitigate those problems. Previously, the report was required to contain a description of at least 20 of the most serious problems facing taxpayers. By reducing the number of Most Serious Problems to the top ten, we have been able to focus on what we consider to be the critical issues currently impacting taxpayers, the IRS, and tax administration. In Appendix 3, you will find a scorecard detailing how TAS assessed the Most Serious Problems in this year's report. [1]

TAS also took the opportunity to reevaluate the Annual Report as a whole and make a few other changes. The Most Serious Problems are shorter, which gives these sections a sharper focus on how the identified problem impacts taxpayers and the IRS. All parts of the report except our legislative recommendations are now consolidated into one volume. For ease of reference and use, we present all of our active legislative recommendations, from this year and prior years, in the "Purple Book." The report also contains a description of the ten tax issues most frequently litigated in the federal courts over the past year, as required by statute, as well as several research studies.

Consistent with the Taxpayer First Act, TAS worked with the IRS to verify the data contained in this report. [2] The only notable exception to this verification process is the research studies found later in this report.

**A Period of Change Within the IRS**

The Taxpayer First Act marks changes not just for the Taxpayer Advocate Service, but for the IRS as well. By passing the Taxpayer First Act, Congress has sent the IRS a clear message that it needs to rethink the way it operates -- the services it provides, its organizational structure, the way it trains employees, and the technology it uses. [3]

*2 The IRS's mission is to "[p]rovide America's taxpayers top quality service by helping them understand and meet their tax responsibilities and enforce the law with integrity and fairness to all." [4] Currently the IRS is struggling on both fronts. Its current inability to meet taxpayers' customer service needs results in an inability to enforce the law fairly for all taxpayers.

The President's Management Agenda emphasizes the importance of high-quality customer service and cites the American Customer Satisfaction Index (ACSI) and the Forrester U.S. Federal Customer Experience Index ™ as key benchmarks.[5] Those indices find the IRS is among the lowest performing federal agencies when it comes to the customer experience. The ACSI report for 2018 ranks the Treasury Department tied for 10th out of 12 Federal Departments and says that "most [IRS] programs score … well below both the economy-wide national ACSI average and the federal government average."[6] The 2019 Forrester report ranked the IRS 13th out of 15 federal agencies and characterized the IRS's score as "very poor."[7]

As I will discuss below, funding constraints are a significant part of the problem. The IRS receives approximately 100 million telephone calls every year,[8] and to provide "top quality service," as its mission statement commits it to do,[9] it requires adequate funding to hire enough employees to answer those calls. But the problems in IRS customer service go beyond just the budget.

While we support the IRS's efforts to expand online accounts and communicate with taxpayers digitally, initiatives like those will not by themselves make the IRS into a customer-focused agency. To truly transform the organization, the IRS must start with a culture shift. If the culture of the organization is one where employees look to minimize interactions with taxpayers in an effort to move work, or where taxpayers who owe money are automatically viewed negatively, then expanding digital services will not improve customer service. The IRS needs to take a holistic view of how it operates and understand what is and is not working. Working collaboratively with TAS to understand what we are seeing in our cases is one of the best ways for the IRS to understand the pain points taxpayers experience and which processes are most likely to break down. Couple this information with a focus on training IRS employees on empathy and taxpayer interaction, as well as focusing on tracking customer service measures such as first contact resolution and fairness, and the IRS can begin the cultural change needed to fundamentally improve its approach to serving its customers.

However, the IRS's shortcomings in its customer service also impact the agency's ability to fairly administer the tax law. At the same time that the IRS is faced with reevaluating its customer service strategy, the Commissioner has placed a renewed focus on enforcement.[10] TAS has been supportive of some of these efforts, particularly increased Revenue Officer hiring to help ensure the agency has a physical presence throughout the country.[11] But this enforcement focus must be coupled with an improvement in taxpayer service *within* enforcement. If the IRS is going to go out into communities to talk to taxpayers who owe back taxes, then those same taxpayers need to be able to get answers to their questions when they call the IRS or have an indicator placed on their account to designate when they might be at risk of economic hardship before they set up a payment plan.[12] To do otherwise will cause harm to those who can least afford it.

 **\*3** To start, the IRS should prioritize improving telephone service on its compliance lines. While the IRS needs to improve telephone service across the board, it is particularly critical that it answer calls from taxpayers after it has garnished wages, levied on bank accounts, or filed notices of federal tax lien against a taxpayer's house. These enforcement actions prompt many taxpayers to call the IRS to resolve their delinquent liabilities, and some of these taxpayers face economic hardship, such as pending eviction, as a result of IRS compliance actions.

By law, the IRS is required to release levies that are causing economic hardships.[13] But taxpayers often cannot reach the IRS to make it aware of their hardships. In fiscal year (FY) 2019, the IRS received about 15 million calls on its consolidated Automated Collection System lines.[14] IRS employees answered only 31 percent, and taxpayers who managed to get through waited on hold an average 38 minutes.[15] The IRS has an obligation to be accessible to these taxpayers, and it should not ramp up enforcement actions beyond the point where it has enough telephone assistors to handle the taxpayer calls those actions generate.

The level of service is even worse for taxpayers calling the balance due line to make payment arrangements or set up installment agreements. Live assistors last fiscal year answered only 26 percent of those calls and wait times averaged about 45 minutes. These are live taxpayers on the line, trying to talk to the IRS about the money they owe.[16] Yet the IRS does not answer 74

percent of these calls. To treat taxpayers with respect, taxpayer services like this must be prioritized. TAS will continue to evaluate the IRS's progress in future reports.

While every organization must find ways to operate within its resources, it should be noted that the IRS's ability to do its job has been constrained by a significant reduction in resources over the past decade. Since FY 2010, the IRS budget has been reduced by about 20 percent after adjusting for inflation, and the IRS workforce has shrunk by about 22 percent. [17] These cuts make little business sense.

The IRS functions as the "accounts receivable" department of the federal government, and it is remarkably efficient. In FY 2018, the IRS collected nearly $3.5 trillion on a budget of about $11.43 billion, producing an overall return on investment (ROI) of more than 300:1. [18] However the IRS cannot continue to be as effective as it has been with a declining budget. As we discuss in our legislative recommendation regarding IRS funding, the current rules for setting IRS funding levels should be reconsidered. A private sector business would continue to provide more funding for its accounts receivable department as long as the funding produced a positive return on investment. Yet the federal budget process generally treats the IRS purely as a cost center, with no explicit recognition that a dollar appropriated to the IRS generally returns substantially more than one dollar in return. We encourage Congress and the Office of Management and Budget to take a hard look at improving the procedures for setting IRS funding levels.

**Report Contents and Taxpayer First Act Implementation**

 *4  This year's Annual Report starts with a look at the Taxpayer First Act. The first group of Most Serious Problems focuses on the IRS's efforts to revise its customer service strategy and some of the key issues it needs to address if it is truly going to transform the way it serves taxpayers and practitioners. We also look at how the IRS's ability to improve customer service is tied to its IT modernization efforts and how adequate IRS funding ultimately impacts both of these areas. The remaining Most Serious Problems look at more focused problems facing taxpayers and practitioners in the areas of customer service and enforcement. Specifically, how the IRS is interacting with certain groups -- such as return preparers, users of Free File, and multilingual taxpayers -- and what the IRS needs to do to improve those interactions. We also examine how certain IRS initiatives -- such as the presence of IRS compliance personnel in Appeals conferences, the Offer in Compromise program, and Combination letters -- are impacting taxpayer rights, and we make recommendations for increasing their effectiveness.

To implement key provisions of the Taxpayer First Act, the IRS has established a dedicated office to oversee and coordinate the agency's TFA implementation efforts. The office is being led by the Commissioner's Chief of Staff and includes executives from the Wage & Investment Division, the Small Business/Self-Employed Division, and the Chief Information Officer's Information Technology function. IRS leadership declined to include a representative from TAS. I find this deeply concerning. Congress created the Office of the Taxpayer Advocate to serve as the statutory voice of the taxpayer within the IRS. No one has a better view into the problems that taxpayers and practitioners face day to day when working with the IRS than TAS. Over the last 20 years, TAS has worked more than 4.4 million cases resulting from problems with IRS systems or processes. [19] That history with individual and business taxpayers' problems gives TAS unique insight, perspective, and information that could be a key resource for identifying areas in need of improvement as the IRS develops a comprehensive customer service strategy.

As the IRS decides how to implement the aptly named "Taxpayer First Act," I believe TAS should have a seat at the table to the same extent as key IRS operating divisions, particularly for purposes of implementing the Act's requirements that the IRS develop a comprehensive customer service strategy, modernize its organizational structure, create online taxpayer accounts, and develop a comprehensive employee training strategy that includes taxpayer rights. Having been excluded from the core implementation group, TAS will participate on executive teams and lower-level working groups and will offer our recommendations to the extent we have an opportunity to do so.

**Closing Thoughts**

March 2020 marks the 20th anniversary of the Taxpayer Advocate Service. [20] Now more than ever, the role of TAS is vital to effective tax administration. In the face of numerous challenges, many of which are detailed in this report, TAS will continue to be here to assist taxpayers who experience economic hardships due to their tax problems and taxpayers who fall through the cracks of the IRS bureaucracy. TAS will continue to advocate for systemic changes within the IRS where IRS procedures are imposing undue burdens on taxpayers. And TAS will continue to use its reports to Congress to identify significant issues and recommend administrative and legislative actions to resolve those issues.

 **\*5**  While I am honored to serve as the Acting National Taxpayer Advocate and will continue to serve in this capacity for as long as necessary, the Office of the Taxpayer Advocate -- and taxpayers -- deserve a permanent appointee. [21] As in other organizations, acting leaders are caretakers -- charged with keeping the trains running on time but lacking the authority to make significant changes and often not taken as seriously as permanent officials. It has now been five months since Nina Olson retired. Given the current crossroads at which the IRS finds itself, it is critical that a permanent National Taxpayer Advocate be appointed as quickly as possible to help ensure the IRS protects taxpayer rights and meets its obligations to taxpayers.

Respectfully submitted,

Bridget T. Roberts

Acting National Taxpayer Advocate

December 31, 2019

**THE MOST SERIOUS PROBLEMS ENCOUNTERED BY TAXPAYERS: Introduction**

Internal Revenue Code (IRC) § 7803(c)(2)(B)(ii)(III) requires the National Taxpayer Advocate to submit an annual report to Congress that, among other things, contains a summary of ten "most serious problems" encountered by taxpayers. In previous years, Congress tasked the National Taxpayer Advocate with identifying at least the 20 most serious problems impacting taxpayers. As noted in the Preface, this change was the result of the recent passage of the Taxpayer First Act. [1]

With the change to the number of Most Serious Problems, TAS revisited its method of selecting its list of ten based on multiple factors. While we rank each year's problems using the same methodology (described below), the list remains inherently subjective in many respects. See Appendix 3 for additional information on how TAS ranked the Most Serious Problems.

**METHODOLOGY OF THE MOST SERIOUS PROBLEM LIST**

The National Taxpayer Advocate is in a unique position to identify the most pressing problems that taxpayers face. Because TAS is an independent part of the IRS, it can serve as the advocate for the taxpayer and use the experience of its staff to identify taxpayer problems to make recommendations to improve the IRS from within the organization. TAS also works with more than 300,000 taxpayers and practitioners every year through its casework and outreach events so it sees problems from an external perspective as well. On a daily basis, TAS employees interact with taxpayers and IRS employees to try to resolve taxpayers' individual problems and make systemic fixes to widespread problems.

The National Taxpayer Advocate becomes aware of potential Most Serious Problems through multiple channels. Trends in TAS's casework, research studies completed by TAS and outside groups, advocacy projects worked by TAS's Office of Systemic Advocacy, and findings from IRS taskforces and teams on which TAS participates often reveal issues. Additionally, the National Taxpayer Advocate hears directly from individuals, including Taxpayer Advocacy Panel members, IRS employees, taxpayers, tax practitioners, and other external stakeholders, through TAS's Systemic Advocacy Management System and other channels. [2]

Reports to Congress. [1] For this report, we reviewed 72 cases decided between June 1, 2018, and May 31, 2019. The majority of cases involved taxpayers failing to report items of income, including some specifically mentioned in Internal Revenue Code (IRC) § 61 such as wages, [2] interest, [3] dividends, [4] and pensions. [5]

**TAXPAYER RIGHTS IMPACTED** [6]

• *The Right to Be Informed*

• *The Right to Pay No More Than the Correct Amount of Tax*

• *The Right to Appeal an IRS Decision in an Independent Forum*

• *The Right to a Fair and Just Tax System*

**PRESENT LAW**

IRC § 61 broadly defines gross income as "all income from whatever source derived." [7] The U.S. Supreme Court has defined gross income as any accession to wealth. [8] The concept of "gross income" is to be broadly construed, while exclusions from income are to be narrowly construed. [9] However, over time, Congress has carved out numerous exceptions and exclusions from this broad definition of gross income, and has based other elements of tax law on the definition. [10]

If the Commissioner determines a tax deficiency, the IRS issues a statutory notice of deficiency. [11] If the taxpayer challenges the deficiency, the Commissioner's notice is entitled to a presumption of correctness; the taxpayer generally bears the burden of proving that the determination is erroneous or inaccurate. [12]

**ANALYSIS OF LITIGATED CASES**

In the 72 opinions involving gross income issued by the federal courts and reviewed for this report, gross income issues most often fell into two categories: (1) what is included in gross income under IRC § 61, and (2) what can be excluded under other statutory provisions. A detailed list of the cases appears in Table 4 of Appendix 5.

In 37 cases (51 percent), taxpayers were represented, while the rest were *pro se* (without counsel). In 12 of the 37 cases where taxpayers had representation (about 32 percent), they prevailed in full or in part in their cases, whereas *pro se* taxpayers did not prevail in full or in part in any cases identified during this review period.

Drawing on the full list in Table 4 of Appendix 5, we have chosen to discuss discharge of indebtedness and a case involving the tax treatment of a *qui tam* award. [13]

**Discharge of Indebtedness**

We reviewed six cases in which taxpayers challenged the IRS's determination that a discharge of indebtedness was taxable income. Taxpayers prevailed in part in one case. [14] Generally, a taxpayer must include income from discharge of indebtedness when calculating gross income, [15] but in certain circumstances cancellation of indebtedness income may be excluded. IRC § 108(a) provides that a taxpayer may exclude, subject to limitations, income from the discharge of indebtedness if the discharge occurs in a title 11 bankruptcy case, when the taxpayer is insolvent, or if the indebtedness is qualified farm indebtedness

(for a taxpayer other than a C corporation), qualified real property business indebtedness debt, qualified principal residence indebtedness discharged before January 1, 2018, or subject to an arrangement that is entered into and evidenced in writing before January 1, 2018. [16] The creditor may issue a Form 1099-C, Cancellation of Debt, to the taxpayer for canceled debts of $600 or more. [17] If a creditor has discharged a debt the taxpayer owes, the taxpayer must include the discharged amount in gross income, even if it is less than $600 or a Form 1099-C is not received, unless one of the exceptions in IRC § 108(a) applies. The issuance of a Form 1099-C is not dispositive of whether or when the debt is actually discharged. [18] A debt is deemed to have been discharged for purposes of information reporting, and a Form 1099-C is required, if and only if, an ""identifiable event" has occurred. [19] Form 1099-C may be required even if the discharged amount is not taxable to the debtor. [20] Generally, the burden of proof is on the taxpayer to show that any of the exceptions in IRC § 108(a) apply. [21] However, if a Form 1099-C serves as the basis for the determination of a deficiency, IRC § 6201(d) may apply to shift the burden of production to the IRS. IRC § 6201(d) provides that in any court proceeding, if a taxpayer asserts a reasonable dispute with respect to the income reported on an information return and the taxpayer has fully cooperated with the IRS, then the IRS has the burden of producing reasonable and probative information in addition to the information return.

**\*110**  In one case we reviewed, the taxpayer prevailed in part under the qualified principal residence exclusion in IRC § 108(a)(1)(E) and in part under the insolvency exception in IRC § 108(a)(1)(B). In the case of *Bui v. Commissioner*, the taxpayer excluded over $350,000 of discharged indebtedness from her gross on her tax year 2011 tax return, indicating that the discharged debt was qualified principal residence indebtedness under IRC § 108(a)(1)(E). [22] At trial, the taxpayer further asserted the discharged indebtedness should be excluded under IRC § 108(a)(1)(B) due to insolvency. The court determined that only $12,000 of the discharged indebtedness was qualified principal residence indebtedness; however, the taxpayer was limited to excluding $5,299 by operation of IRC § 108(h)(4), which allows a taxpayer to exclude only the amount that exceeds the portion of the debt discharged that is not qualified principal residence debt. The taxpayer's original loan was $250,000, of which $12,000 was determined to be qualified principal residence debt. The total discharged debt was $243,299, and subtracting the $238,000 of nonqualified debt allowed the taxpayer to exclude $5,299.

At trial, the Commissioner conceded that at the time of the discharge of indebtedness, the taxpayer was insolvent by the amount of $42,852. [23] While the taxpayer asserted the Commissioner was incorrect in this calculation, the taxpayer had already agreed to the calculation prior to trial and thus the court found the taxpayer could exclude $42,852 from gross income under the insolvency exclusion.

*Qui Tam* Award

During this review cycle, we identified one case that addressed the tax treatment of a *qui tam* award. [24] A *qui tam* action is brought under a statute by a private individual on behalf of the government and if the claim succeeds, the individual keeps a portion of the recovery while the rest goes to the government or other public institution. In the case of *Barnes v. United States*, Mrs. Barnes filed a *qui tam* action under the False Claims Act [25] and then reached a settlement agreement with the United States and the defendants for over $20 million, of which she received over $3.5 million. [26]

Mr. and Mrs. Barnes reported the settlement amount on their joint income tax return and paid tax on it. They then filed a refund claim on the basis that settlement proceeds from a *qui tam* action are not taxable. After the IRS disallowed the claim in part, they filed a refund suit under the theory that the award Mrs. Barnes received for her *qui tam* action was not taxable income and further argued that if the court found the award to be taxable income, that it should be taxed as a capital gain rather than ordinary income. [27] The court agreed with the government's argument that a *qui tam* award is rightly classified as a bounty or fee rewarding the individual who initiated the *qui tam* action for assisting the government in making and successfully litigating the claim. A bounty or fee is not excluded under IRC § 61 and is thus includable in gross income. Further, the court disagreed with the taxpayer's contention that the *qui tam* award, if taxable, should be taxable as capital gains and found for the government that the award is taxable is ordinary income. The taxpayers argued that the award should be a capital gain based on the accretion

12  *See* National Taxpayer Advocate 2020 Purple Book, *Compilation of Legislative Recommendations to Strengthen Taxpayer Rights and Improve Tax Administration* 51-52 (*Direct the IRS to Study the Feasibility of Using an Automated Formula to Identify Taxpayers at Risk of Economic Hardship*).

13  IRC § 6343 (a)(1)(D).

14  IRS, Joint Operations Center, Snapshot Reports: Enterprise Snapshot (week ending Sept. 30, 2019). IRS data for the consolidated ACS lines includes calls to the Installment Agreement/Balance Due telephone line. The Installment Agreement/Balance Due line assists taxpayers who have unpaid taxes but whose cases generally have not yet been assigned to ACS.

15  *Id*.

16  IRS, Joint Operations Center, Snapshot Reports: Product Line Detail (week ending Sept. 30, 2019).

17  IRS response to TAS information request (Oct. 2, 2019).

18  IRS, 2018 Data Book, Table 1: Collections and Refunds, by Type of Tax (May 2019); Department of the Treasury, *FY 2020 Budget-in-Brief* 69 (2019), https://home.treasury.gov/system/files/266/FY2020BIB.pdf.

19  Taxpayer Advocate Management System (TAMIS) data pulled by TAS (Oct. 1, 2001 to Oct. 1, 2019).

20  TAS was established in its current form by the Internal Revenue Service Restructuring and Reform Act (RRA 98), Pub. L. No. 105-206, § 1102, 112 Stat. 685, 698-702 (1998) (codified at IRC §7803(c)). After extensive planning, TAS commenced operations in March 2000.

21  IRC § 7803(c)(1)(B)(ii) provides, in relevant part: "The National Taxpayer Advocate shall be appointed by the Secretary of the Treasury after consultation with the Commissioner of Internal Revenue and the Oversight Board." The IRS issued a public statement on May 13 soliciting applications. *See* IRS Statement, *IRS seeking candidates interested in National Taxpayer Advocate position* (May 13, 2019), https://www.irs.gov/newsroom/irs-statement-on-the-national-taxpayer-advocate-position. In June and early July, the Commissioner and Assistant Secretary (Tax Policy) interviewed leading candidates for the position. No appointment has been made and no additional information has been provided since that time.

1  Taxpayer First Act, Pub. L. No. 116-25, 133 Stat. 981 (2019).

2  The Systemic Advocacy Management System (SAMS) is a database of systemic issues and information reported online to TAS by IRS employees and members of the public. https://www.irs.gov/advocate/systemic-advocacy-management-system-sams. TAS reviews and analyzes the submissions and determines a course of action, which can include information-gathering projects, immediate interventions, and advocacy projects. Internal Revenue Manual (IRM) 1.4.13.4.9.2, Systemic Advocacy Management System (SAMS) (Sept. 17, 2019).

1  *See* Taxpayer Bill of Rights (TBOR), www.TaxpayerAdvocate.irs.gov/taxpayer-rights. The rights contained in the TBOR are now listed in the Internal Revenue Code (IRC). *See* IRC § 7803(a)(3).

2  John A. Koskinen, Commissioner of Internal Revenue, Address to National Press Club (Mar. 31, 2015).

3  President's Management Agenda 7, 28 (Sept. 19, 2019), https://www.whitehouse.gov/wp-content/uploads/2018/03/Presidents-Management-Agenda.pdf.

4  American Customer Satisfaction Index, *ACSI Federal Government Report 2018*, at 3-4 (Jan. 2019), https://www.theacsi.org/images/stories/images/govsatscores/19jan-Gov-report-2018.pdf.

5  Rick Parrish, *The US Customer Experience Index 2019: How Brands Build Loyalty with the Quality of Their Experience*, Forrester Research 16 (June 2019).

6  *See* Taxpayer First Act, Pub. L. No. 116-25, § 1101, 133 Stat. 981 (2019) (The provision provides that the strategy shall include "a plan to provide assistance to taxpayers that is secure, designed to meet reasonable taxpayer expectations, and adopts appropriate best practices of customer service provided in the private sector, including online services…."). In addition, the Cross-Agency Priority goals included in the President's Management Agenda highlighted the need for improved customer experience with federal services, and set the specific goal of providing a modern, streamlined, and responsive customer experience. Office of Management and Budget, *CAP Goal Action Plan: Improving Customer Experience with Federal Services* 2, https://www.performance.gov/CAP/action_plans/FY2018_Q1_Improving_Customer_Experience.pdf (last visited Nov. 26, 2019).

7  *See* Most Serious Problem: *IRS Funding: The IRS Does Not Have Sufficient Resources to Provide Quality Service*, *infra*; Most Serious Problem: *Information Technology Modernization: The IRS Modernization Plan's Goal to Improve the Taxpayer Experience Is Commendable, But the IRS Needs Additional Multi-Year Funding to Bring It to Fruition*, *infra*.

8  TAS has made a number of recommendations related to improving customer service over the years. For a list of recommendations made by the National Taxpayer Advocate over the last seventeen years, see Appendix 1, *Past TAS Recommendations on Taxpayer Service*, *infra*.

9  While an Executive Readiness Candidate from TAS is assigned to the TFAO as Assistant to the Project Director for Taxpayer Experience, this individual is on a developmental detail to the TFAO and is not at the same level as a TAS executive.

10  IRS Reform and Restructuring Act of 1998 (RRA 98), Pub. L. No. 105-206, § 1205; H.R. Rep. No. 109-307, at 209 (2005).